If it pleases the Court, my name is Charles Talbott. I represent Barbara Nathan. It is appealing the termination of her Social Security Disability Benefits. Ms. Nathan was found disabled as a result of an accident. She was found disabled in 2004. Three years later, on a review, the Social Security Administration decided that she had improved her physical health, and so they terminated her benefits. That decision was affirmed by an appeals judge, an administrative law judge, and by the lower court. Now, the focus here, at least initially in my argument, is I'm not going to start off with talking about back and forth between what medical evidence should have been accepted or not accepted or how it was interpreted. I'm going to go to sort of the end and focus at least initially on the testimony and the opinion of the vocational expert in this case. In the course of the workup of this case, the state agency folks reviewed some of the evidence in this case, both mental and physical, and came up with restrictions applicable to Barbara. Now, the administrative law judge essentially rejected most of the treating medical doctor's opinions in this case and turned to the state agency doctors and their restrictions placed upon the plaintiff based, or Ms. Nathan based upon review of the medical records. And the administrative law judge used their section three restrictions to phrase the hypothetical question to the vocational expert to get the testimony that there were several jobs that, based upon the hypothetical question, that Ms. Nathan could do. The problem is that the section three section of the physical evaluation workup that was done by the state agency doctors does not include all of the restrictions found in the section one portion of that workup. I thought under the guidelines they looked at the section three to the narrative statement by the doctor. Indeed. For determining what are the restrictions that are to be applied. That's true. But here's the problem with certainly the way it was done in this particular case. The section one part of that form is supposed to be a checklist. Basically, what did they find when they went through the medical records? And then the section three. Well, if you read the explanatory notes from the agency about that form, it's to sort of alert the psychiatrist or psychologist or whoever is doing the doctor, whoever is completing the form, what they need to consider. Right. The problem is. And then they give their little narrative assessment. Sure. They didn't consider everything. That's the problem. If you take a look at the section one part of the form. Which one are we talking about here? All right. We're talking what's found at page 335 in the record. Hold on. Now, at 335 in the record and going over to 336, you'll find that there's seven moderate limitations in that form expressed as far as how Ms. Nathan is limited in her abilities. If you go to the narrative section. Wait. Let's see. Go to the narrative on. The narrative is on 337. Okay. Hold on a second. Okay. If you look at the narrative section, it discusses the fact that she's limited to simple and some complex tasks without interruption from psychiatric symptoms, and she can have brief public contact and may have some difficulty managing change. Those are two descriptors, but there's seven descriptors in the first section. And the vocational expert testified that the most important descriptors in there are the moderate limitations on her ability to complete a normal work day and work week without interruption from her symptoms. I won't read the whole thing. She has moderate limitations to do activities on a schedule and maintain regular attendance, and she's limited to her focus and concentration for extended period. Those are not discussed in the narrative section. And when the vocational counselor was asked the question whether a moderate limitation would be equivalent to a 20% impact on the work ability, she testified that's a reasonable limit. And when these additional limitations were put in the question to the vocational expert, all work activity was precluded. So you can't just read the third section to the exclusion of the first section because they're both important. And I grant the fact that the rules say that the POMs say that the third section is really the narrative portion, but the first section is just as important because it's to be used as a checklist. And you can't ignore Section 1 limitations. You have to discuss them in Section 3. That didn't happen in this case. And when those additional limitations were expressed to the vocational expert, she testified that Ms. Nathan was unable to do any work activity. Now, the other problem in this case. Just one second before you move on. What were the limitations in Section 1 that were not carried over into Section 3 for us? If you go for A3, that's the one that says understand and remember detailed instructions. That is included in the RFC question. And same with the B5 limitation to carry out detailed instructions. But when you get to the B6, the B7, the B8 limitations, those are expressed on page 335 of the record. And you go over to B11, which is on the next page. Those are not included in the narrative section. And then the C12, which is the interacting with the general public, that is included in the RFC. So your argument is, is that if they check the box, when they get down to their analysis or their functional capacity assessment analysis, having checked any box where it says moderate or whatever, they ought to address it in Section 3? Absolutely. Well, I understood the palms to be that Section 1, and I admit I'm no expert at this. I mean, my goodness. But that Section 1 was only intended to alert the evaluator what to consider to think about in formulating the assessment. Not that they necessarily had to. Remember, it's the same person doing both. Yes. The Section 1 part of the form is not written by some other individual, which suggests to the reviewer these are the things you have to look at. The author of the Section 1 part of the form is the same as the author of the Section 3 part of the form. All right. So if you sit down and say, I've got these seven items that are present in this particular case, based on my review of the record, it seems to me that your obligation then in the Section 3 part of the form is to talk about that and not ignore it. Okay. All right. Got it. And what they did is they really covered about three, or the individual doing this report covered about three or four out of the seven. And when you have these other significant limitations and you pose that to the vocational expert, who agrees that a moderate limitation equates to a 20% of the time impact, all work is precluded. Now, the commissioner cites the sample case and says, well, the vocational expert is not qualified to interpret medical information. That's not what happened here. The medical information was interpreted by the state agency folks, put it down as moderate limitations in the Section 1 part of the form, and all that the vocational expert is doing is simply reviewing what the state agency people undertook. But there's another aspect of this case, too. Understand that a state agency reviewer is somebody who sits in an office and reads papers. They don't have any face-to-face contact with Ms. Nathan. We have a couple of people in here. Dr. Choi, for example, did an examination of Ms. Nathan. He's what's referred to as a DDS reviewer. He is somebody that the Social Security Administration hires to sit down with Ms. Nathan and do a mental workup of her. And he came to some conclusions that significantly interfere with her ability to work, which conclusions were rejected by the ALJ. Now, the ALJ comes up with this notion that she exaggerated or didn't use her best efforts in testing with Dr. Choi when he expressed his mental limitations. And she points to the fact of Ms. Nathan's work history and that somehow she was a supervisor of 30 people in the course of her work as a CNA. If you look at the earnings records here, it's clear that Ms. Nathan is not a high-function supervisory-type person. She's worked fairly steadily, but her earnings are fairly low, which would indicate work at a fairly low level. And her testimony was she worked as a CNA, which is basically a person that does physical chores in a medical setting. She's not a supervisor. She's never worked at any high level. And there's no support here for the fact that she exaggerated or she didn't use her best efforts in the course of Dr. Choi's assessment. And Dr. Choi was certainly aware and mentioned her work history in the course of his assessment. So he was aware of her background. And Dr. Choi is considered under the rules to be an expert. And Social Security hires Dr. Choi to do an assessment. He writes a report, and the ALJ rejects it. You know, if that's going to be the case, why have the examination done at all if you're not going to use it? So his restrictions are sufficient. Another problem is Ms. Nathan has to- But if your argument is correct, then why even have a hearing at all? You just simply adopt the examiner's findings. Well, I've been doing this work for 37 years. Okay. And I can't tell you how many times in 37 years I have seen state agency doctor assessments where they say, this person is disabled. They have all of these issues. They can't work. We end up in hearings. They ignore these routinely. I don't know why. But we routinely get medical reports, whether they're for physical problems or mental problems, that put very significant limitations on individuals to a degree that even the untrained could say this person cannot work. And they're routinely passed over by the state agency reviewers. I don't have an answer for you why that happens, but I see it a lot. Did you want to save some time for rebuttal, just in case? Yes. Okay. That would be good. And I'll shut off if there's any further questions. Thank you. Good morning, Your Honors. I'm Daphne Binet, appearing for defendant appellee, Commissioner of Social Security. With respect to the argument regarding Section 3 of the Mental Residual Functional Capacity Forum, a defendant would like to first point out that the argument that Ms. Nathan has made in her reply brief about the mental residual functional capacity assessment in Section 3, not addressing all of the checkbox limitations, was not made before this court in Ms. Nathan's opening brief. It wasn't made in the district court, and therefore it should be considered waived. And I've cited authority in our opening brief as to a waiver when issues aren't raised before the district court. In terms of issues not being raised in the opening brief before this court, authority for that is Bray v. Commissioner, 554F3, 1219 at 1226, note 7. Even despite the waiver, it's contention it should be held waived. But if the court were to consider this argument, it really doesn't have any merit. And the reason for that is, as I understood it, Mr. Talbot was saying in his reply brief that A3 and B5 were not included in the assessment. And from today's argument, I'm understanding that he's now saying that it was. But assuming that he's saying it wasn't, and without waiving our objection, I would note that the assessment here in terms of A3 and B5 were sufficiently accommodated because First, Clayton provides no support for the suggested argument that some complex tasks did not account for a moderate limitation in A3 or a moderate limitation in carrying out detailed instructions. But in this case, in any event, the ALJ found the claim more limited as he found that you could perform, understand, remember, perform simple tasks. And this is at ER 21, finding 10. He did not find that she could perform complex tasks. With respect to the moderate. I mean, in other words, the IJA accounted for that limitation? Correct. He found her even more limited. But what I'm saying is, first, Mr. Talbot doesn't provide any support that even the state agency assessment doesn't account for that because the assessment is actually understand, remember, perform simple and some complex tasks. So that does account for what the state agency was saying. And in any event, the ALJ found the claim, in this case, even more limited. And that finding is at ER 21, finding 10. With respect to the moderate checkbox limitations in B6, 7, and 11, and the contentions that, at least in the reply brief, that they weren't addressed in Section 3, we believe that's also incorrect. Because if you were to read Dr. Collingwood's actual mental residual function capacity assessment taken together, and this is A, B, C, D, and then the last paragraph here, it indicates as long as Ms. Nathan is limited to understanding, remembering, and performing simple and some complex tasks, she can do so without interruption from psychiatric symptoms. And that's ER 337, Section A and B explanation. And in the last paragraph, Dr. Collingwood said that Ms. Nathan also retains the capacity for productive tasks with noted limitations. With respect to the contentions of ER 337, I guess ADLs is activities of daily living. That's correct. MER is? Medical evidence of record. Medical evidence of record. And PER? PER. Just standard from the medical evidence of record. Just standard English. Oh, PER. Yeah, it's confusing. PER, medical examination records and activities of daily living. Claim it can. AB refers to 1A and 1B. Right. If you go to Section 1, the AB refers to Category A, which is understanding, remembering, and B refers to sustained concentration and persistence. Right. So she can perform simple and some complex tasks without interruption from psychiatric symptoms. That's correct. That's correct, Gerard. And in terms of, and we raised this in our opening brief too, in terms of being asked to assume that this means 20% impact, which as we pointed out in our opening brief, that's not the definition. That was plaintiff's attorney's assumed limitation. There is a case from this court that does address this, and the case name is Israel v. Astru. It's an unpublished disposition from October 12, 2012. The citation is 2012 Westlaw 4845578. I have copies, which I can provide to the court and counsel. And basically that case is important here because first, in that case, the court rejected the type of argument that when a plaintiff's attorney asks the V.E. to assume an impact for the percentage of time that a claimant would be impacted, the court rejected that argument that a V.E. at that point is even responding to the checkbox limitations. And what instead the V.E. is responding is to the claimant's interpretation when the V.E. is asked to assume the claimant would be limited a certain percentage of time. Also, this case is important because it has, in that case, the court rejected the argument that the ALJ has to individually weigh the limitations identified by the non-examining State agency doctrine each checkbox in Section 1. But that opinion, that disposition, is not precedential. I understand that, Your Honor. I became aware of this case after I submitted my briefing, and I did do research in preparation for this argument, particularly like what you replied to. But it's hard to see how it would lay down a principle that we would have to apply in all cases rather than being just the statement of what happened in that particular case. I understand, Your Honor. It's just that from my perspective, I looked, and these were the only two cases in the Ninth Circuit addressing it other than the Ornberg case. And the Ornberg was consistent in saying, you know, this is not a mental residual function past the assessment. So if I understand your position, it's not that it's binding on us, but that we should adopt the reasoning used in the case, right? That's correct. It's not binding on us. We don't have to adopt it, right? That's right. That's right. I mean, two different panels have come to this conclusion, and I think that it's well-reasoned. Okay. I would also like to point out, in terms of the argument that I think the reply brief about, oh, perhaps, excuse me, I'm jumping ahead of myself, I wanted to address the contention about, you know, ALJ then concluding that based on the claim it was underperforming and exaggerating. ALJ just didn't make that statement. He provided the basis for that conclusion, and the ALJ did this at year 25 through 26, and that was the ALJ based that conclusion based on the treatment records from Cascade Mental Health, and she also based it on the statements to Dr. Gaffield in reaching that conclusion. So a plaintiff might disagree with that interpretation. That's not the function of this court on review. And then with respect to the contention of using plaintiff's work history against her, the ALJ explained this also at page 25 through 26, and he did provide support for the conclusion that, and this was at year 138, that Ms. Nathan had reported supervising 30 people. And I would note that under the regulations, even though I think Mr. Talbot has pointed out the fact that, you know, these were low earnings, even under the regulations, substantial gainful activity, work can be considered substantial gainful activity even if there's no pay or profit realized, which certainly wasn't this case. She did earn money. And then if I may, I would just like to touch on briefly on some points made in the reply brief, because I believe that at least one of the assertions about there not being improvement in medical improvement was based on a citation to an incorrect finding made by, the incorrect finding in this case. Let's see if I can find it here. Let's see. And this was at pages four to five in the assertion that, you know, as far as the physical abilities, that, you know, there was no increase in her physical abilities. But this assertion is based on a citation of the wrong RFC. On page five, the finding cited to is that ER 21 finding 10, but the correct medical improvement related to ability to work RFC finding is actually at ER 21 finding seven. And contrary to Mrs. Nathan's assertion, there was medical improvement related to ability to work because there was an increase in the residual functional capacity. And the reason for that is because previously she was found to not even be able to engage in eight-hour-a-day work activity, which is the standard for finding someone not disabled to perform other work in the national economy. And this is at ER 18 finding number two where it said that she could stand or walk for less than two hours and then sit for six hours. That totals less than eight hours, Your Honor. But if you look at the ALJ's explanation at ER 21 finding eight, he notes that she could stand or walk for two hours in an eight-hour day. And she could also walk for six hours under the ALJ's medical improvement related to ability to work finding. So there was actually an increase in residual functional capacity because the claimant can now do sedentary work. She can now perform work during an eight-hour day. With respect to the waiver issue, I would just say that with regard to the attack on the Edlund panel decision, the court knew what it was doing there. Although it did not cite to a specific case in support of the waiver, it's consistent with the circuit's waiver law. And we know that because another re-judge panel, which there was a majority of two in the Warray case, and that's 439F3-1001 at page 1007, cites to the Edlund case for the proposition about waiver. And I would also note that in terms of this distinction about de novo review, this court has recognized in applying the waiver rule, and this occurred in Edlund, in Macri, in Warray, that they were reviewing de novo the district court's decision with respect to, you know, the ALJ's decision. But this court has also recognized that it independently reviews de novo the ALJ's decision. And those cases are Tidwell v. Apfel, 161F3-599-601, and Moore v. Commissioner, 278F3-920-924, 9th Circuit, 2002. And I would also note, too, that this court itself even applies a waiver rule at its own level, and that case is Bray, you know, at the same time, while it's conducting its own independent de novo review. Okay. Thank you, Your Honors. Thank you. Let's see, I believe you had, Counsel, if the appellant had a few minutes of available time. Thank you. With respect to counsel's argument that we didn't discuss the mental RFC form, the residual functioning capacity form, in our opening brief, if you'll find it on page 43 of our opening brief, both in the text and the footnote, where we discussed at length the fact that there were limitations expressed in the Section 1 part of the mental residual functional form that's seemingly missing from the Section 3 form. And as I said at the outset, I think you have to cover all of them. If there's seven limitations expressed in Section 1, you have to discuss seven limitations in Section 3. As far as the review of the other evidence is concerned, the concern we have is it appears that the judge was acting much in the way of a medical expert when rejecting certain evidence, both of a physical nature, particularly from Dr. Deacon, and of a mental nature from Dr. Choi. And these are expert individuals, and the judge is not in a position to take the same facts and data that the doctors are using to come, I think, to a different conclusion. And so I have to rely on their expertise. Now, the impact of their statements is up for the ALJ to assess, but you can't take the same facts and data that the doctors had and arrive at a different conclusion, particularly in view of the fact these doctors are sitting face-to-face with Ms. Nathan, doing an assessment, doing an examination, and writing their report. So unless you believe they're somehow incompetent, I think you have to accept their assessment of the patient. Thank you. Okay. Thank you, counsel. Both counsel, we appreciate your arguments. And the matter will be submitted, and that ends our session for today.
judges: Benitez, Schroeder, Paez